IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

LORETHA TAYLOR *ex rel.* T.L. )
)
Claimant, ) No. 15 CV 3176
)
v. ) Jeffrey T. Gilbert
) Magistrate Judge
CAROLYN W. COLVIN, Acting )
Commissioner of Social Security, )
)
Respondent. )

## MEMORANDUM OPINION AND ORDER

Claimant Loretha Taylor ("Claimant") seeks review of the final decision of Respondent Carolyn W. Colvin, Acting Commissioner of Social Security ("Commissioner"), denying Claimant's application for childhood supplemental security income ("SSI") on behalf of her minor child T.L. under Title XVI of the Social Security Act. Pursuant to 28 U.S.C. § 636(c) and Local Rule 73.1, the parties have consented to the jurisdiction of a United States Magistrate Judge for all proceedings, including entry of final judgment. [ECF No. 5.]

Pursuant to Federal Rule of Civil Procedure 56, Claimant has moved for summary judgment. [ECF No. 14.] For the reasons stated below, Claimant's Motion for Summary Judgment is granted, and the case is remanded for further proceedings consistent with this Memorandum Opinion and Order.

## I. PROCEDURAL HISTORY

Claimant filed an application for SSI on September 19, 2011, alleging a disability onset date of January 1, 2008 for T.L. (R. 17.) After an initial denial and a denial on reconsideration, Claimant filed a request for an administrative hearing on May 29, 2012. (R. 17, 111-13, 115-18,

120-22.) Claimant, represented by counsel, appeared and testified before an Administrative Law Judge ("ALJ") on December 13, 2013. T.L. also appeared and testified, as did the psychological expert Dr. Demetri Dres. (R. 44-108.)

On January 3, 2014, the ALJ issued a written decision denying Claimant's application for SSI based on a finding that T.L. was not disabled under the Social Security Act. (R. 17-38.) The opinion followed the three-step sequential evaluation process that applies to a child disability analysis under the Social Security Regulations. 20 C.F.R. § 416.924. The ALJ found at step one that T.L. , who was 12 years old at the time of the hearing, had not engaged in substantial gainful activity since her application date of September 29, 2011. (R. 20.) T.L.'s severe impairments at step two included borderline intellectual functioning, a learning disorder, and attention deficit/hyperactivity disorder ("ADHD"). The ALJ also found that oppositional-defiant disorder and a cognitive impairment constituted non-severe impairments. (R. 20.) At step three, none of T.L.'s impairments met or medically equaled listings 112.02 (organic mental disorders), 112.05 (mental retardation), or 112.11 (attention deficit/hyperactive disorder), either singly or in combination. (R. 20-23.) The ALJ further concluded that T.L.'s impairments were not functionally equivalent to any listing. (R. 23-37.) He therefore determined that she was not disabled. (R. 38.) The Social Security Appeals Council subsequently denied Claimant's request for review, and the ALJ's decision became the final decision of the Commissioner. (R. 1-3.) Claimant now seeks review in this Court pursuant to 42 U.S.C. § 405(g). *See Haynes v. Barnhart*, 416 F.3d 621, 626 (7th Cir. 2005).

## II. STANDARD OF REVIEW

A decision by an ALJ becomes the Commissioner's final decision if the Appeals Council denies a request for review. *Sims v. Apfel*, 530 U.S. 103, 106-07 (2000). Under such

circumstances, the district court reviews the decision of the ALJ. *Id.* Judicial review is limited to determining whether the decision is supported by substantial evidence in the record and whether the ALJ applied the correct legal standards in reaching her decision. *Nelms v. Astrue,* 553 F.3d 1093, 1097 (7th Cir. 2009).

Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401 (1971). A "mere scintilla" of evidence is not enough. *Scott v. Barnhart,* 297 F.3d 589, 593 (7th Cir. 2002). Even when there is adequate evidence in the record to support the decision, however, the findings will not be upheld if the ALJ does not "build an accurate and logical bridge from the evidence to the conclusion." *Berger v. Astrue,* 516 F.3d 539, 544 (7th Cir. 2008). If the Commissioner's decision lacks evidentiary support or an adequate discussion of the issues, it cannot stand. *Villano v. Astrue,* 556 F.3d 558, 562 (7th Cir. 2009).

The "findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). Though the standard of review is deferential, a reviewing court must "conduct a critical review of the evidence" before affirming the Commissioner's decision. *Eichstadt v. Astrue,* 534 F.3d 663, 665 (7th Cir. 2008). It may not, however, "displace the ALJ's judgment by reconsidering facts or evidence." *Elder v. Astrue,* 529 F.3d 408, 413 (7th Cir. 2008). Thus, judicial review is limited to determining whether the ALJ applied the correct legal standards and whether there is substantial evidence to support the findings. *Nelms,* 553 F.3d at 1097. The reviewing court may enter a judgment "affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g).

3

Prior to 1996, a child was considered disabled if he or she had a physical or mental impairment that was of comparable severity to one that would disable an adult. 42 U.S.C. § 1382c(a)(3)(A) (1994); 20 C.F.R. § 416.924 (1996); *Scott*, 297 F.3d at 593-94. Congress altered this standard under the Personal Responsibility and Work Opportunity Reconciliation Act ("PRWORA") to require a more stringent showing by a juvenile claimant seeking SSI disability. *Scott*, 297 F.3d at 594 n.5. A child is considered disabled under the PRWORA standard if he "has a medically determinable physical or mental impairment, which results in marked and severe functional limitations" for a period of at least twelve months. 42 U.S.C. § 1382c(a)(3)(C)(i); *Harris v. Barnhart*, 231 F. Supp.2d 776, 779-80 (N.D. Ill. 2002).

To determine if such an impairment exists, the Social Security Administration has promulgated regulations that limit the familiar five-step process applicable to adult claimants to three steps. The ALJ's inquiry asks: (1) is the child engaged in substantial gainful activity? (2) does the child have a medically determinable impairment that is severe? and, (3) do these impairments meet, medically equal, or functionally equal one of a list of severe impairments set forth in the regulations? 20 C.F.R. § 416.924(b)-(d). An affirmative answer at step one ends the analysis, and a child must be found not to be disabled regardless of her age or medical condition. 20 C.F.R. § 416.924(b). A negative answer at step two also requires a finding that the child is not disabled. 20 C.F.R. § 416.924(c).

Unlike the step three requirements applicable to an adult claimant – which refer only to an impairment that "meets or equals" a listing requirement, 20 C.F.R. § 416.920(d) – the regulations state that a child also satisfies the third step when her condition functionally equals a listed impairment. 20 C.F.R. § 416.924(d). This requirement permits a finding of disability if a

child's impairment or combination of impairments result in one of two possible findings. First, the impairments must give rise to "marked" limitations in two of six "domains of functioning," including (1) acquiring and using information, (2) attending and completing tasks, (3) interacting and relating with others, (4) moving about and manipulating objects, (5) caring for oneself, and (6) health and physical well-being. 20 C.F.R. §§ 416.926a(a) & 416.926a(b)(1)(i)-(vi). A limitation is marked if it "interferes seriously" with a child's ability to independently begin, sustain, or finish activities. 20 C.F.R. § 416.926a(e)(2)(i). Such a limitation is "more than moderate" and is equivalent to what one would expect for the functioning level of a child whose standardized test scores are at least two, but less than three, standard deviations below the mean. *Id.* In the alternative, impairments functionally equal a listing requirement when they constitute an "extreme" limitation in one of the six domains of activity. 20 C.F.R. § 416.926a(a). A limitation is extreme if it "very seriously" interferes with a child's ability to initiate, sustain, or complete activities. 20 C.F.R. § 416.926a(e)(3)(i). An extreme limitation indicates the "worst limitations," though it does not require a complete loss of functioning. It indicates a functioning level expected for a child whose standardized test scores are at least three standard deviations below the mean. *Id.*

## III. DISCUSSION

Claimant asserts that the ALJ erred at step three. Unfortunately, it is not entirely clear what the full scope of her argument concerning the ALJ's alleged error includes. Claimant argues that T.L.'s impairments met or medically equaled listings 112.02 and 112.11 because the ALJ improperly found that T.L. did not have a marked limitation in the functional domains of attending and completing tasks and interacting and relating to others. The problem with that claim is that the question of whether a child meets or medically equals listings 112.02 and 112.11

only concerns the specific criteria set out in the listings themselves. As discussed below, those criteria do not include the functional domains of attending to tasks or relating to others. The six domains of a child's functioning only come into play when an ALJ addresses the question of whether the child functionally equals a listing, not when he considers the issue of whether she meets or medically equals it.[1] Claimant's conflation of these two standards makes it unclear what part of the ALJ's decision she is disputing. The evidentiary basis of her argument fails to clarify the matter. Claimant contends that the ALJ improperly assessed the opinions of (1) T.L.'s treating physicians, (2) the testifying psychological expert Dr. Dres, and (3) the state-agency expert Dr. Kirk Boyenga. That, too, creates confusion as to what Claimant is actually disputing: T.L. did not have a treating physician; Dr. Dres did not testify on the functional equivalency issue; and the ALJ did not rely on Dr. Boyenga to assess the "meets or equals" topic.

Liberally construed, Claimant's motion is best interpreted as challenging all aspects of the ALJ's step three analysis even though the evidence that Claimant cites confuses the meets, medically equals, and functionally equals steps that a child disability case requires. The Commissioner construes the Motion for Summary Judgment in that way. The Court follows the Commissioner's lead and addresses all aspects of the ALJ's step three decision.

A.     The "Meets or Medically Equals" Issue

When an ALJ considers if a claimant's impairments meet or equal a listing, the ALJ must identify the relevant listing by name and provide more than a perfunctory analysis of its

---

[1] The ALJ stressed that point in his decision. He found that T.L. had a marked limitation in the functional domain of acquiring and using information but stated that did not mean that she also had a marked limitation in her cognitive/communicative functioning under listing 112.02(B)(2). (R. 21.) The ALJ correctly recognized that although similar evidence can apply to the "meets or equals" analysis and the functional equivalency analysis, these two aspects of a child disability case cannot be conflated with another.

requirements. *Barnett v. Barnhart*, 381 F.3d 664, 668 (7th Cir. 2004). "Whether a claimant's impairment equals a listing is a medical judgment, and an ALJ must consider an expert's opinion on the issue." *Id.* at 670. Nevertheless, an ALJ's failure to state the reasons why a listing is not met does not require remand unless the claimant first shows why substantial evidence demonstrates that she has met or equaled the listing in question. *Scheck v. Barnhart*, 357 F.3d 697, 700-01 (7th Cir. 2004); *Alesia v. Astrue*, 789 F. Supp.2d 921, 932 (N.D. Ill. 2011).

### 1. Listing 112.02

Listing 112.02 requires a claimant to show that he suffers from abnormalities in perception, cognition, affect, or behavior that are associated with a brain dysfunction. A two-pronged analysis applies. First, the claimant must establish that a Paragraph (A) disturbance exists. That includes one of ten different disturbances such as a developmental delay, a memory or cognitive impairment, a perceptual or thinking disturbance or an impairment of impulse control. 20 C.F.R. Pt. 404, Subpt. P, App.1, § 112.02(A)(1)-(10). Second, the claimant must satisfy Paragraph (B). For a child between the ages of three and 18, at least two marked impairments must exist in age-appropriate (1) cognitive/communicative functioning, (2) social functioning, (3) personal functioning, or (4) concentration, persistence, and pace. 20 C.F.R. Pt. 404. Subpt. P, App.1, § 112.02(B)(2)(a)-(d).

The ALJ concluded that T.L. did not meet or equal either the Paragraph (A) or the Paragraph (B)(2) factors. Claimant does not identify which of the Paragraph (A) disturbances she claims the ALJ considered incorrectly, or what evidence supports a different finding on the issue. That would ordinarily require no consideration of her claim. *See United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991) ("A skeletal 'argument', really nothing more than an assertion, does not preserve a claim."). Claimant also does not cite the record in any meaningful way

concerning the relevant Paragraph (B)(2) factors, which the ALJ discussed at length. That, too, could support a finding that remand is not necessary on the Paragraph (B)(2) issue. *Scheck*, 357 F.3d at 700-01 (stating that the claimant must present substantial evidence contradicting the ALJ's finding). The Commissioner therefore argues that Claimant has waived the entire listing 112.02 issue by only presenting a series of conclusory allegations that fail to tie the record to the ALJ's analysis.

The Commissioner's position is not without some merit. Courts are not obligated to seek out arguments that the parties have not clearly made. *See Dunkel*, 927 F.2d at 956 ("Judges are not like pigs, hunting for truffles buried in briefs."). On the other hand, this case presents a number of factors that weigh against the Commissioner's argument. The ALJ's decision is unusually lengthy and depends on a complex interplay between the medical evidence, the experts' opinions, and alleged conflicts between those opinions. The ALJ also took the relatively rare step of giving only "slight" weight to the hearing testimony of his own expert Dr. Dres. (R. 26-27.) The testifying psychologist stated that T.L. met the Paragraph (A) and Paragraph (B)(2) factors of listing 112.02 and was therefore presumptively disabled. (R. 105-07.) The record shows that numerous errors attended the ALJ's analysis of Dr. Dres' testimony, and that those shortcomings affected significant portions of the ALJ's grounds for finding that T.L. was not disabled. For these reasons, the Court respectfully disagrees with the Commissioner and finds that fundamental fairness requires an analysis of the full scope of the ALJ's step three analysis.

    a.    **Paragraph (A)**

Dr. Dres testified in broad terms at the hearing that T.L. met Paragraph (A) without identifying which of Paragraph (A)'s ten disturbances he thought applied to her. (R. 106.) The Commissioner claims that the ALJ properly rejected Dr. Dres' testimony on the matter, but the

Commissioner is also silent on what disturbance is at issue or what evidence supports the ALJ's decision. For his part, the ALJ merely stated the following: "I give slight weight to Dr. Dres' testimony that the claimant meets listing 112.02A[.]" (R. 20.) That neither identified the relevant aspect of Paragraph (A) that the ALJ thought he was rejecting nor suggests what evidence he relied on to dismiss Dr. Dres' opinion. It is well established that an ALJ "must articulate at some minimal level his analysis of the evidence." *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994); *see also Baker ex rel. Baker v. Barnhart*, 410 F. Supp.2d 757, 766 (E.D. Wis. 2005). The ALJ's failure in this case to state what Paragraph (A) disturbance was at issue or to cite any evidence related to it does not meet that standard. Such oversight may not require remand when no evidence exists to support the position that a claimant meets a listing. *See Scheck*, 357 F.3d at 701. That is not the case here because, as discussed below, the record shows that T.L. experienced at least some disturbances in three of the Paragraph (A) categories – concentration, attention, or judgment, cognitive functioning, and impulse control in social settings. 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 112.02(A)(8)-(10).

The ALJ may have thought that he was addressing the Paragraph (A) issue because he cited T.L.'s cognitive/communicative functioning, social functioning, and concentration, persistence, or pace immediately after stating that she did not satisfy Paragraph (A). (R. 20.) Insofar as he assumed that addressed the matter, the ALJ overlooked that the functional areas he cited only concern Paragraph (B)(2). They are not part of Paragraph (A)'s criteria. The ALJ therefore improperly conflated the listing's careful distinctions between the Paragraph (A) disturbances and the functional areas outlined in Paragraph (B)(2). That provides no discussion of the listing issue at all. Remand is therefore required so that the ALJ can identify the Paragraph (A) factors that apply and explain his reasons for rejecting Dr. Drew' testimony. *See*

*Minnick v. Colvin*, 775 F.3d 929, 935-36 (7th Cir. 2015) ("This is the very type of perfunctory analysis we have repeatedly found inadequate to dismiss an impairment as not meeting or equaling a Listing.").

### b.       Paragraph (B)(2)

The Paragraph (B)(2) topic presents a more complex set of problems. Dr. Dres testified that T.L. met the (B)(2) criteria because she had marked limitations in her (1) cognitive/communicative functioning, (2) social functioning, and (3) concentration, persistence, and pace. That satisfied Paragraph (B)(2)'s requirement that a child have a marked impairment in at least two of the four functional categories identified in the listing. Dr. Dres' testimony, and the ALJ's discussion of it, involved T.L.'s school records, Claimant's testimony, and reports issued by several examining consultants and T.L.'s teachers. Each is discussed below.

### (1)       Cognitive/Communicative Functioning

Dr. Dres' evaluation of T.L.'s cognitive/communicative functioning depended heavily on evaluations that were administered by Michael Ryan M.S. between April and June 2013 at St. Bernard Hospital. (R. 383.) T.L. was 12 years old at the time and was completing the fifth grade. Mr. Ryan was supervised by Dr. David Smith, who issued a formal report on June 13, 2013. Two tests were of particular importance. The first was the Weschler Intelligence Scale for Children ("WISC-IV"). T.L.'s overall IQ score was 75. That placed her in the bottom five percent of her peers and indicated borderline intellectual functioning. T.L.'s verbal comprehension score ("VCI") was 71, putting her in the bottom three percent of her peers. The working memory index ("WMI") came in at the bottom one percent. (R. 386.) The second test was the Wide Range Achievement Test ("WRAT-4"), which assesses a child's grade-level ability to read words, comprehend sentences, and do spelling and math. T.L. scored in the

bottom one percent for word reading. The examiners concluded that meant T.L. could only read at a grade level of 1.4 even though she was completing the fifth grade. T.L.'s sentence comprehension score was in the bottom two percent, meaning that she performed at a 1.7 grade level. The spelling results placed her at a grade level of 2.1; math computation came in at grade 3.7; and T.L.'s reading composite score placed her in the bottom one percent of her peers. (R. 388-89.)

The ALJ questioned Dr. Dres' reliance on these scores at the hearing by noting that T.L.'s fifth grade special education teacher Anita Santacruz had submitted a report that could lead to other conclusions.[2] Contrary to the WISC-IV and WRAT-4 results, Ms. Santacruz stated that T.L. was reading at the third grade level based on a different test format, the Benchmark Assessment System ("BAS"). T.L.'s written language level was also at a third grade level, while her math skills were at the fourth grade level. (R. 270.) Dr. Dres reviewed Ms. Santacruz's test scores but continued to believe T.L. suffered from a marked restriction under the results of Dr. Smith's report. In his decision, the ALJ rejected the St. Bernard assessments that Dr. Dres relied on, concluding instead that the BAS test results accurately reflected T.L.'s "maximum level of functioning." (R. 21.)

The ALJ did not adequately explain why Dr. Dres' opinion concerning T.L.'s cognitive functioning was wrong based on Ms. Santacruz's report. Even if Ms. Santacruz was correct that T.L. could read at the third grade level, that still put her two grades behind her current placement

---

[2] The Commissioner suggests that Ms. Santacruz's report was an Individualized Education Plan ("IEP"). An IEP is a written statement required by the Individuals With Disabilities Education Act ("IDEA"), 20 U.S.C. § 1401 *et seq.*, that maps out how a school district will provide a "free and appropriate public education" that is tailored to a disabled student's individual needs. *See Todd v. Duneland Sch. Corp.*, 299 F.3d 899, 905-06 (7th Cir. 2002). Ms. Santacruz's report adopts the form of an IEP. However, it plainly states that it was issued at the request of the Social Security Administration

in the fifth grade. The ALJ never explained why that meant that T.L.'s restriction was less than marked.

His task was not merely to determine the best that T.L. could do. The regulations do not ask an ALJ to assess a child's "maximum" functioning; they require the adjudicator to decide the degree to which that functioning is age-appropriate. 20 C.F.R. Pt. 404, Subpt. P., App. 1, § 112.02(B)(2)(a). The ALJ never considered the question of how a child who can only read two (or possibly three, now that T.L. was in the sixth grade) levels below her actual placement in school may not be functioning in an age-appropriate manner. The ALJ's silence on this issue makes it impossible to follow the logic of his reasoning. T.L.'s school records suggest serious limitations in her reading skills. One IEP, for example, described T.L. as a "non reader" who had "extreme difficulty reading sight words at even the very basic level. She is not able to read a passage on any level and answer comprehension questions." (R. 364.) That suggests a finding of a marked limitation as that term is defined in the regulations. *See* 20 C.F.R. Pt. 404, Subpt. P., App. 1, § 112.00(C) (stating that a marked limitation may exist "even when only one [functional area] is impaired, as long as the degree of limitation is such as to interfere seriously with the ability to function . . . independently, appropriately, effectively, and on a sustained basis").

The ALJ's general discussion of the record noted some of T.L.'s reading limitations, including those outlined in this IEP. However, the ALJ never explained how he reached his decision given such serious restrictions. That is problematic because other evidence supported Dr. Dres' reliance on the St. Bernard report. T.L. underwent a consultative exam with clinical psychologist Dr. Jeffrey Karr on November 30, 2011. Dr. Karr's report is addressed in greater detail below. Like the St. Bernard evaluators, Dr. Karr also applied the WISC-IV test and

---

instead of being part of a school district's annual IDEA review.

assessed VCI and PRI scores. They were even lower than those cited by Dr. Dres (67 and 78, respectively, instead of 71 and 86). (R. 315.) That presumably meant that T.L. was, in fact, reading at the low level that Dr. Dres told the ALJ was the case. The same result was reached when T.L. was in the fourth grade, when T.L.'s teacher Ms. Graham issued a report stating that T.L. was reading at the first grade level. (R. 218.) Instead of explaining why the BAS reading scores accurately reflected T.L.'s cognitive functioning, the ALJ attacked the reliability of the St. Bernard report that Dr. Dres cited for his finding. He noted that the St. Bernard tests had been given by Michael Ryan M.S. instead of by an M.D. or Ph.D. (R. 21, n.2.) That is troubling on three grounds. First, it undercuts the ALJ's own reliance on the BAS scores included in Ms. Santacruz's report. The record provides no information on who administered the BAS test that Ms. Santacruz cited or what that person's academic qualifications were. The ALJ could not logically attack the St. Bernard tests because of Mr. Ryan's credentials without applying the same standard to the BAS scores.

Second, it is not clear why the ALJ thought that Mr. Ryan was even required to be an M.D. or a Ph.D. to administer the WISC-IV or WRAT-4. Listing 112.00 does not require tests to be administered by someone who holds these degrees. It only states that psychological tests used to evaluate mental disorders must be administered by a "qualified specialist." "By 'qualified,' we mean the specialist must be currently licensed or certified in the State to administer, score, and interpret psychological tests and have the training and experience to perform the test." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 112.00(D)(6). The ALJ provided no explanation as to why Mr. Ryan did not fall within that category. Third, the ALJ claimed that T.L.'s school assessments were more reliable than the St. Bernard tests because they were given by individuals who knew T.L. better. (R. 27.) The regulations, however, do not require that a qualified

13

specialist must know the claimant before reliably administering a psychological test. Even if they did, the ALJ had no evidentiary basis for his reasoning because the record yields no information on who gave the BAS test to T.L. or how well he or she knew T.L.

Having questioned the reliability of Mr. Ryan, the ALJ also doubted that Dr. Smith, who supervised him, could have been a reliable source of information because he "did not have an established long-term relationship with the claimant." (R. 20.) It is true that Dr. Smith appears to have been an examining instead of a treating source for T.L. *See* 20 C.F.R. § 404.1502 (defining a treating source as one "who has, or has had, an ongoing treatment relationship with you"). The ALJ had no ground, however, for concluding that Dr. Smith was unreliable based on that fact alone. An examining source's report is entitled to weight, including the greatest weight, when substantial evidence supports it. *See Lechner v. Barnhart*, 321 F. Supp.2d 1015, 1031-32 (E.D. Wis. 2004); *Samuel v. Barnhart*, 295 F. Supp.2d 926, 948 (E.D. Wis. 2003); *see also Knight v. Chater*, 55 F.3d 309, 314 (7th Cir. 1995) ("Medical evidence may be discounted if it is internally inconsistent or inconsistent with other evidence" in the record). In this case, Dr. Smith's report was largely consistent with other evaluations of T.L.'s cognitive functioning given by Dr. Karr and Ms. Graham. All three were inconsistent with the BAS test that the ALJ said reflected T.L.'s maximum level of functioning. The ALJ was not entitled to dismiss Dr. Smith for not being a treating source without first discussing the consistency of his report with these other medical and school assessments. *See* 20 C.F.R. § 404.1527(d)(2).

The ALJ's greatest evidentiary basis for dismissing the St. Bernard report was Dr. Karr's psychological assessment of T.L. After assessing T.L.'s WISC-IV scores, Dr. Karr diagnosed her with oppositional-defiant disorder, ADHD, and borderline intellectual functioning. (R. 317.) Dr. Karr was nevertheless concerned with what he characterized as T.L.'s "uneven participation"

in the testing process. He stated: "Claimant though not overtly oppositional, worked unevenly; at times appeared interested and able to persist; other times was indifferent, worked carelessly and gave up easily. Throughout, her approach was impulsive, with subsequent inattention to detail. She seemed increasingly impatient, [and] required repeated instructions." (R. 316.) Based on these observations, Dr. Karr concluded that his WISC-IV results should be seen "as a minimal estimate of her capacities, given [T.L.'s] uneven participation as described above."[3] (R. 316.) The ALJ then cited that finding to discount the value of Dr. Smith's test results. He claimed that T.L. "gave insufficient effort during the St. Bernard testing process," which allegedly rendered her scores "invalid." (R. 20, 21.) Indeed, the ALJ went further by implying that T.L. had no one to blame but herself for the impatience and disruptions that allegedly led to her low test results. (R. 21, "[I]t is apparent that the claimant has not demonstrated sufficient effort during academic or IQ testing.")

Substantial evidence does not support the ALJ's line of reasoning on this issue. Not even Dr. Karr concluded that T.L.'s low WISC-IV scores were "invalid." He only said they reflected her "minimal" functioning. That implies that they were valid but not necessarily representative of the best that T.L. could do. The ALJ never explained how he could find that Dr. Karr's and St. Bernard's scores were invalid when no medical expert said that was the case. Dr. Dres, who was the only expert who reviewed the entire medical record, carefully explained to the ALJ that T.L.'s relatively similar reading scores assessed at St. Bernard's were not invalid, stating that

---

[3] Despite his reliance on it, the ALJ never said what weight Dr. Karr's report deserved. The ALJ was required to assign a weight to Dr. Karr's report and explain the reasons that supported his finding. 20 C.F.R. § 404.1527(d) ("Regardless of its source, we will evaluate every medical opinion we receive."); *Craft v. Astrue*, 539 F.3d 668, 676 (7th Cir. 2008) ("The ALJ is required to determine which treating and examining doctors' opinions should receive weight and must explain the reasons for that finding."). Since this case requires remand, the ALJ is directed to do so.

nothing in the report indicated "that the testing results are considered to be invalid or in any way amiss, misassessment, miscalculation of her ability." (R. 102.) Instead of explaining why he disagreed with this expert medical conclusion, the ALJ erroneously substituted his non-expert opinion for it. That requires remand in itself. *See Rohan v. Chater*, 98 F.3d 966, 970 (7th Cir. 1996) ("ALJs must not succumb to the temptation to play doctor and make their own independent medical findings.").

Moreover, the behaviors that Dr. Karr described – uneven participation, carelessness, impatience, and impulsiveness – are all symptoms of ADHD. The ALJ never considered the possibility that, far from being volitional behaviors that T.L. could have controlled had she wanted to do so, T.L.'s symptoms were the involuntary effects of her severe impairment of ADHD. Courts have been very clear that a diagnosis of ADHD, even taken alone, necessarily implies serious behavioral issues that an ALJ must take into account. "To diagnose a child as having ADHD, a clinician must find either marked inattention or marked hyperactivity over a period of time. Therefore, the ADHD diagnosis alone reflects a medically documented finding of marked inattention, marked hyperactivity, or both." *Taylor ex rel. McKinnies v. Barnhart*, 333 F. Supp.2d 846, 854 (E.D. Mo. 2004); *see also M.N. ex rel. Rodriguez v. Colvin*, 2014 WL 1612992 at *8 (N.D. Ill. April 22, 2014) ("Courts have found that an ADHD diagnosis itself implies a significant level of inattention, hyperactivity, or impulsivity."). The ALJ's reasoning on this issue amounted to the puzzling conclusion that, while T.L. suffered from ADHD, her low test results were suspect *because* she displayed the symptoms that are inextricably linked to her impairment. That is not only illogical, it defies established case authority. The Seventh Circuit has instructed that a child who suffers from ADHD cannot be blamed for behavior that stems from the disorder itself. *See Hopgood ex rel. L.G. v. Astrue*, 578 F.3d 696, 702 (7th Cir. 2009)

16

("[W]e reject the ALJ's line of thinking that [the child] is to blame for his [school] difficulties, which are textbook symptoms of ADHD.").

Even if Dr. Karr's WISC-IV scores were invalid, moreover, the ALJ never explained why the same conclusion applied to the St. Bernard scores. The St. Bernard tests were given almost 18 months after Dr. Karr saw T.L. The ALJ failed to note that the St. Bernard report does not document the behaviors that Dr. Karr noted earlier. It only states that T.L. was "relatively indifferent" to the questions posed to her. (R. 383.) The ALJ assumed that meant that she displayed the same impatience and inattention that Dr. Karr noted. Yet the report goes on to state that T.L. "had no difficulty remaining in her seat and completing all tasks asked of her." (R. 383.) That does not suggest the degree of impatience or impulsiveness that the ALJ said existed. In the absence of any discussion of the issue, the ALJ had no basis for criticizing T.L.'s low St. Bernard scores based on statements that Dr. Karr made in his report 18 months earlier.

In addition to T.L.'s school records and medical reports, the ALJ also relied on her extracurricular activities to assess her cognitive/communication skills as well as other aspects of her functioning. T.L. told the ALJ that she had been on the basketball team during the fifth grade but had been kicked off for fighting. She had been placed back on the team during the sixth grade on condition that her behavior improve. (R. 66-68.) Claimant testified that T.L. had been in the sixth grade for four months at the time of the December 2013 hearing. (R. 80.) T.L. was still on the team because she had only been suspended from school once during that period. (R. 64.) The ALJ placed great emphasis on T.L.'s improved school conduct during this brief time to conclude that she could perform better on her academic tests "when it was in her best interest." (R. 26.) The ALJ interpreted that to mean that, since T.L. could improve her social behavior when it suited her, she also had control over her academic performance.

"Consequently," the ALJ said, "the results that she produced were not consistent with the results that she could have produced." (R. 26.)

The ALJ provided no reasoned explanation for such a conclusion. Setting aside the facts that T.L. suffers from borderline intellectual functioning, a learning disorder, ADHD, and has an IQ of 75, (R. 20-21, 389), the ALJ overlooked that psychological expert Dr. Dres addressed this issue at the hearing. He told the ALJ that T.L.'s standardized scores were valid even though her conduct had improved. In fact, the expert testified that T.L.'s WISC-IV scores supported the disparity between her interest in athletics and her poor reading and verbal scores. Dr. Dres stated: "Her perceptual reasoning, and here we have, you know, body performance as an athlete, is higher than her verbal. And it's not unusual then under these kinds of circumstances to see a person able to excel, let's say as an athlete, but still have difficulty with the verbal component." (R. 103.) That is, the expert drew a distinction between T.L.'s ability to play on the basketball team and her capacity for performing well in her cognitive/communicative functioning. That directly contradicts the ALJ's conclusion on the issue. Without discussing the matter, therefore, the ALJ had no basis for using his own interpretation of the matter to refute Dr. Dres' expert interpretation of T.L.'s WISC-IV scores. *See Rohan*, 98 F.3d at 970.

Listing 112.02 makes clear that a child's cognitive/communicative function should be measured based on medical findings, evidence from parents and others who have information about the child, and "the results of appropriate standardized psychological tests of language and communication." 20 C.F.R. Pt. 404, Subpt. P., App. 1, § 112.02(B)(2)(a). Since Dr. Dres relied primarily on T.L.'s test results, and since the ALJ failed to address the reasons why that reliance was unjustified, substantial evidence does not support the ALJ's rejection of Dr. Dres' opinion on T.L.'s cognitive/communicative functioning.

18

### (2)    Social Functioning

Listing 112.00 defines social functioning as a child's ability to form and maintain relations with parents, adults, and peers. Impairments in a child's functioning can be evidenced by aggression towards others or inappropriate internalized behaviors such as isolation. 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 112.00(C)(2)(b). A "marked" impairment for social functioning or any other symptoms of a childhood mental disorder means less than extreme but more than moderate. "A marked limitation may arise when several activities or functions are impaired[.]" 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 112.00(C). An ALJ must consider how a child functions compared to other non-impaired children her age. That includes consideration of how the child functions in all relevant settings, including school, home, or the community. 20 C.F.R. § 416.924a.

The ALJ disagreed with Dr. Dres' opinion on T.L.'s social functioning because the ALJ thought that Claimant had told him that T.L. got along well with her, T.L.'s teachers, and her siblings. In reality, Claimant contradicted every aspect of what the ALJ ascribed to her. Far from getting along with her older sister and younger brother, Claimant explained that T.L. argues and hits them on a daily basis. (R. 84, "Every day there's still a hit, somebody hit somebody.") Claimant expressed strong concern on this topic, particularly as it involved physical violence against T.L.'s four-year old brother. (R. 93.) T.L. herself admitted that her brother irritated her simply by talking and playing. (R. 61.) Claimant never told the ALJ that T.L. got along with her. She stated instead that T.L. even threatened to commit suicide when Claimant asked her to wash the dishes. (R. 94.)

Claimant further explained that T.L.'s disruptive behaviors were not limited to her home life. They also occur in public settings. T.L. got into a physical altercation with her sister at a

McDonald's restaurant, where she broke a baby stroller. (R. 86.) She is also aggressive toward strangers, though she picks and chooses her targets. (R. 89; R. 90, "And she always get[s] into it with people[.]") She once cursed at a server in a fast food restaurant. (R. 86.) As for the teachers, Claimant explained that T.L. had struck a teacher in the third grade such that "she could have pressed charges against [T.L.]." (R. 78.) T.L.'s school behavior is so aggressive that her teachers refer to her as a "thug." (R. 92, 96.)

After misstating Claimant's testimony on these topics, the ALJ then concluded that Claimant was not entirely credible concerning other aspects of her testimony on social functioning. Claimant told the ALJ that T.L. "talks back" to her and to T.L.'s grandmother. The ALJ rejected that claim because the objective record allegedly failed to support it. Yet L.T.'s fourth grade IEP states that she engaged in physical fights with family members "and parents." (R. 368.) *See also* SSR 96-7p ("An individual's statements . . . may not be disregarded solely because they are not substantiated by objective medical evidence.").[4] More importantly, the ALJ's focus on such relatively minor misconduct as "talking back" to her mother minimizes T.L.'s extensive misbehavior towards a wide spectrum of people. Dr. Karr noted that T.L. "has trouble getting along with others" and was "described as defiant, untruthful, and argumentative." (R. 316.) She was once threatened with psychiatric hospitalization after attacking other girls at Hartgrove Hospital. (R. 384.)

T.L.'s serious behavioral issues are amply illustrated by her school records, which

---

[4] The ALJ stated along the same lines that the record did not support Claimant's testimony that T.L. did not have friends her own age. (R. 22.) In support, he cited the St. Bernard psychological report. That report only states that T.L. told the examiner that she liked to spend time "with friends." (R. 385.) It says nothing about the ages of those friends. The ALJ was not entitled to construe such neutral evidence to mean that T.L.'s friends were her own age. He cited no other part of the record to support his doubts about Claimant's testimony on this topic.

confirm every aspect of Claimant's testimony on that topic. T.L.'s teacher Ms. Graham noted that she was "very manipulative" and had to be moved to another room "after inappropriately interacting with a teacher." (R. 219, 221.) The 2011-2012 IEP noted that T.L. displayed both verbal and physical aggression towards other children and adults. (R. 364.) She received special education services for her inappropriate behavior because T.L. "has consistently exhibited negative interactions with adults and peers over the years. . . . [T.L.] is known as the bully in the classroom. She intimidates her peers and has even assaulted staff on more than one occasion, causing her to be suspended three times this year." (R. 368.) The next year's IEP noted that T.L. could be helpful towards her peers. (R. 395.) But it also stated that she could display verbal and physical aggression that hurt her academic performance, that she had "poor peer relations at times," and that she needed additional special education services to improve her ability to resolve conflicts constructively. (R. 402, 404, 406.) The ALJ himself noted that T.L. had been suspended between 15 and 20 times for aggression during the fifth grade. (R. 20.) She had also been suspended once during the four months that she had been in the sixth grade prior the administrative hearing. (R. 64.)

Instead of discussing how this evidence supported his finding, the ALJ tried to discredit Claimant because he disbelieved her April 2012 statement to the Social Security Administration that T.L. did not play on a sports team at school. (R. 22, 245.) That misreads the record. The ALJ thought that his point was justified by an IEP noting that T.L. participated on the basketball team. The IEP in question, however, concerned T.L.'s fifth grade activities. (R. 399.) T.L. was in the fourth grade in April 2012. Her fourth grade IEP does not mention any team sports. (R. 341-77.)

Having discounted Claimant's credibility, the ALJ next cited a number of other factors to dismiss Dr. Dres' testimony concerning T.L.'s social functioning. He noted that her fourth grade teacher Ms. Graham stated that she had no problem in taking turns in a conversation. (R. 21.) That is true, though Ms. Graham had only known T.L. for three months. (R. 221.) More important was the report of Ms. Santacruz, who had known her for 18 months. Ms. Santacruz said that T.L. had an "obvious" problem in taking turns. (R. 273.) Claimant was also clear that T.L. did not take appropriate turns in conversations with her sister. (R. 74, "It's always an argue[ment], a fight, a slammed door.") Dr. Karr described her as defiant and argumentative, and T.L. herself told the St. Bernard evaluators that when she was angry (and the record supports an inference that was not infrequently) "I don't want anyone to talk to me. I say 'shut up.'" (R. 316, 385.) The ALJ did not account for these facts that worked against his conclusion. An ALJ is never required to discuss every piece of evidence in the record. By the same token, however, "[a]n ALJ has the obligation to consider all relevant . . . evidence and cannot simply cherry-pick facts that support a finding of non-disability while ignoring evidence that points to a disability finding." *Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010) (citation omitted).

As in his analysis of T.L.'s cognitive/communication functioning, the ALJ laid great stress on T.L.'s participation on the basketball team to discount Dr. Dres' opinion. He noted that T.L. had improved her school behavior after being told that she needed to do so if she wanted to stay on the team. However, the ALJ never explained why T.L.'s ability to improve her school behavior during the sixth grade meant that Dr. Dres was incorrect about her social functioning. T.L.'s modified behavior only encompassed a four-month period by the time of the December 2013 hearing. An ALJ is obligated to consider a child's limitations on a longitudinal basis and not to decide the issue based on an isolated time frame within the disability period. *See* SSR 09-

2p. T.L.'s alleged disability period began on January 1, 2008. The ALJ's failure to address why

T.L.'s four-month period of improved behavior applied to the preceding five-and-a-half years of

her disability period makes it impossible to follow the basis of his reasoning on this issue.[5] *See*

*Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 351 (7th Cir. 2005) ("In addition to relying on

substantial evidence, the ALJ must also explain his analysis of the evidence with enough detail to

permit meaningful appellate review."). The evidence on the issue is clear: T.L. had 15 to 20

school suspensions during the fifth grade; she was verbally and physically aggressive towards

peers and staff during the fourth grade; and she hit a teacher in the third grade. (R. 20, 78, 364.)

Even if the ALJ's reasoning was sound concerning T.L.'s school behavior, he ignored her

unimproved home and social conduct. The regulations require an ALJ to consider a child's

ability to get along with parents, family members, and others in the community. 20 C.F.R. Pt.

404, Subpt. P, App. 1, § 112.00(C)(2)(b). Social Security Ruling 09-2p makes the point clear by

directing ALJs to ask, "[w]here does the child have difficulty with activities – at home, in

childcare, at school, or in the community?" SSR 09-2p. The ALJ never accounted for T.L.'s

ongoing disruptive behaviors with her siblings, about which her mother expressed serious

---

[5] The ALJ seems to have assumed as he did with her cognitive functioning that T.L. could control her behavior if she would only try harder. He stated, for example, that she was "not resistant to correction" once the school told L.T. that she could only stay on the basketball team if her conduct improved. (R. 22.) As with T.L.'s ADHD, the ALJ does not appear to have considered the possibility that her aggressive behavior could have been a symptom of her oppositional-defiant disorder. Both Dr. Karr and Dr. Smith diagnosed T.L. with that disorder. (R. 317, 390.) The ALJ found at step two that, based Dr. Smith's limited contact with T.L. and her improved behavior in the sixth grade, oppositional-defiant disorder only constituted a non-severe impairment. (R. 20.) That is questionable for the reasons discussed above. Even if the ALJ was correct, however, he was still "required to consider the aggregate effects of a claimant's impairments, including impairments that, in isolation, are not severe." *Getch v. Astrue*, 539 F.3d 473, 483 (7th Cir. 2008). That includes the step three listing analysis. *See Alesia*, 789 F. Supp.2d at 932. Many of T.L.'s documented behaviors appear to be textbook symptoms of that impairment. *See* http://www.webmd.com/mental-health/oppositional-defiant-disorder (last visited Sept. 18, 2016) ("ODD is a condition in which a child displays an ongoing pattern of . . . . behavior [that] often disrupts the child's normal daily activities, including activities within the family and at school.").

concerns. (R. 83, "It's been driving me crazy.") Thus even if the ALJ had been correct in relying on T.L.'s recent behavioral improvement at school, he failed to follow the regulations' guidelines to consider the full extent of her domestic and community life activities.

### (3)    Concentration, Persistence, and Pace

In determining whether a child's limitations in concentration, persistence, and pace meet or medically equal a listing, an ALJ should consider "observations of the child in the course of standardized testing and in the course of play." 20 C.F.R. Pt. 404, Subpt. P., App. 1, § 112.00(C)(2)(d). The ALJ should also consider school grades and the need for special education when a child is between the ages of six and twelve. 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 112.00(C)(3).

The record demonstrates that T.L.'s ability to carry out activities, studies, and tasks varied widely. As noted earlier, Dr. Dres testified that the discrepancy between her WISC-IV verbal comprehension and perceptual reasoning scores (71 v. 86) meant that variabilities existed in T.L.'s capacity for becoming involved in, and being successful at, activities. (R. 103.) The ALJ noted that T.L.'s fourth grade teacher stated that she showed eagerness in some classes "while avoiding all challenges in another." (R. 219.) That supports, rather than undermines, Dr. Dres' testimony on T.L.'s persistence and pace. The same is true of Dr. Karr's report, which documented T.L.'s impatience, impulsiveness, and lack of focus. The consulting psychologist noted that T.L.'s approach to the tests was erratic. She was interested at times, but at "other times was indifferent, worked carelessly and gave up easily" while showing "inattention to detail." (R. 316.) Dr. Smith also noted that T.L. was "relatively indifferent to whatever was asked of her." (R. 383.)

24

The ALJ dismissed the seriousness of Dr. Karr's observations on the ground that T.L. was not currently taking any medication to treat the symptoms of her ADHD. However, the only information the ALJ had concerning this issue was Claimant's generalized statement that T.L. had been medicated for one month at an unspecified point and had shown some improvement. (R. 95-96.) Nothing in the record suggests what that improvement included or what effect continued ADHD medication would have had on T.L.'s impulsiveness. Nor did the ALJ discuss why T.L. was no longer taking her medication. Claimant explained that she had to stop buying the prescription because she did not have medical insurance. (R. 95, 100.) The ALJ never addressed that issue. He was not entitled to cite the absence of ADHD medication to discount Dr. Dres' opinion without first doing so. *See Shauger v. Astrue*, 675 F.3d 690, 696 (7th Cir. 2012) ("[A]n ALJ must first explore the claimant's reasons for the lack of medical care before drawing a negative inference."); *see also* SSR 96-7p ("However, the adjudicator must not draw any inferences about an individual's symptoms and their functional effects from a failure to seek or pursue regular medical treatment without first considering any explanations that the individual may provide[.]").

The ALJ also cited T.L.'s teacher Ms. Santacruz for the proposition that T.L. showed "few" problems in her concentration, persistence, and pace. (R. 22.) That is not the case. Ms. Santacruz stated that T.L. had a "serious"problem in three areas (organizing school and personal items, taking turns, and carrying out multi-step instructions) and an "obvious" problem three others (refocusing, changing from one activity to another, and completing work accurately). (R. 272.) Moreover, T.L.'s school records repeatedly link her difficulties in staying on task with her behavioral problems. The 2011 IEP, for example, stated that she required additional individualized assistance to complete tasks because T.L. "has poor retention skills and lacks the

25

academic skills at her grade level to complete assignments given independently. Due to her poor skill set in these areas, [T.L.] will often engage in off task behaviors such as" talking, aggression, and defiant behaviors. (R. 366.) Other IEP entries support that finding. (R. 402, 404.)

The ALJ tried to bolster his analysis by citing a teacher's comment that T.L. was able to complete 100 percent of her assignments. (R. 22, 406.) Without more, however, that fails to explain anything meaningful about her concentration. T.L. was receiving multiple special education accommodations at school. The regulations advise that "good performance in a special education setting does not mean that you are functioning at the same level as other children your age who do not have impairments." 20 C.F.R. § 416.924a(b)(7)(iv). T.L.'s special education modifications allowed her to be "in close proximity [to teachers], accommodating her and keeping her on task." (R. 404.) She received frequent verbal reminders of rewards and punishments, as well as verbal and tangible rewards. (R. 404.) T.L. also required small group settings to remain on task. (R. 395.) Before he could rely on T.L.'s ability to complete her class assignments, the ALJ was obligated to account for these accommodations in order to compare her functioning to her non-impaired peers. Unfortunately, he never did so. The ALJ's silence on the matter fails to follow the regulations' directive and does not build a logical bridge between the record and his conclusion that Dr. Dres was not correct in finding a marked limitation in T.L.'s concentration, persistence, or pace.

## 2. Listing 112.11

Listing 112.11 requires a claimant with ADHD to satisfy a two-step analysis. First, he must produce medical evidence showing that he suffers from marked inattention, impulsiveness, and hyperactivity. As the conjunctive "and" suggests, all three behaviors must exist at the marked level. Second, a child between the ages of 3 and 18 must demonstrate that such ADHD-

26

related symptoms result in at least two of the Paragraph (B)(2) criteria that are required under listing 112.02 (organic mental disorders). 20 C.F.R. Pt. 404, Subpt. P., App. 1, § 112.11. As discussed earlier, that includes marked impairments in age-appropriate (1) cognitive/communicativefunctioning, (2) social functioning, (3) personal functioning, or (4) concentration, persistence, and pace. 20 C.F.R. Pt. 404. Subpt. P, App.1, § 112.02(B)(2)(a)-(d).

The ALJ identified listing 112.11 in his step three analysis. However, he gave no reason for finding that L.T. did not meet or equal it. (R. 20.) Nor did the ALJ identify what medical source he relied on to reach his decision. Dr. Dres did not address ADHD at the hearing. The state-agency expert Dr. Boyenga, as well as the reconsideration experts Drs. Hinchen and Low, did not identify ADHD as one of T.L.'s impairments in their disability evaluation forms. (R. 318-23, 334-39.) Both sets of experts recognized in their narrative discussions that she had been diagnosed with that disorder, but they identified T.L.'s sole impairment as a learning disorder. (R. 318, 334).) As explained below, moreover, the ALJ failed to adequately explain why he gave great weight to Dr. Boyenga and moderate weight to Dr. Hinchen and Dr. Low. The only issue the ALJ discussed concerning T.L.'s ADHD was that she was not taking medication to alleviate her symptoms. That was erroneous for the reasons discussed above. The ALJ's minimal reasoning, combined with the absence of a medical opinion on the issue, renders his account of the listing 112.11 topic erroneous.

B. **The Functional Equivalency Issue**

Having decided that T.L. did not meet or medically equal a listing, the ALJ proceeded to assess whether she functionally equaled a listing by addressing the six domains of functioning: (1) acquiring and using information, (2) attending and completing tasks, (3) interacting and relating with others, (4) moving about and manipulating objects, (5) caring for yourself, and (6)

health and physical well-being. As noted above, a child meets the functional equivalency standard when she has either an extreme limitation in one of these domains or marked limitations in two of them. 20 C.F.R. § 416.926a. The ALJ concluded that T.L. had a marked restriction in acquiring and using information. He found less than marked limitations in all of the other domains. Only the second and third of the functional domains are at issue in this case.

Unlike the meets or equals analysis, the ALJ's functional analysis did not address Dr. Dres' opinion. That was because the ALJ never asked the testifying expert to express an opinion on T.L.'s functioning in any of the six domains. The ALJ relied instead on the expert opinion issued by the state agency physician Dr. Boyenga and the report issued on reconsideration by state-agency doctors Dr. Hinchen and Dr. Low. (R. 23-33.) Those reports are discussed more fully below.

1. **Attending and Completing Tasks**

In this domain, the ALJ considers "how well you are able to focus and maintain your attention, and how well you begin, carry through, and finish your activities, including the pace at which you perform activities and the ease with which you change them." 20 C.F.R. § 416.926a(h). Attention involves a child's level of alertness, ability to filter out distractions, and capacity to change focus when interruptions occur. 20 C.F.R. § 416.926a(h)(1)(i). Children between the ages of six and 11 should be able to focus on a variety of school and home-related activities, including reading and family chores. Those between 12 and 18 should be able to do so in more complex settings and be able to complete long-range academic assignments. 20 C.F.R. § 416.926a(h)(2)(iv)&(v). Examples of limited functioning that could be either marked or extreme include being easily startled, being slow to complete activities, being sidetracked from tasks or easily frustrated, and needing extra supervision to complete tasks. 20 C.F.R. §

28

416.926a(h)(3)(i)-(v).

The ALJ addressed T.L.'s functioning in this domain based on reasoning similar to that used to address her concentration, persistence, and pace. He once again cited Dr. Karr's finding that T.L. was inattentive and impulsive but dismissed it because she was not taking ADHD medication. (R. 32-33.) That falls short as a reasoned analysis for the reasons discussed before. That said, the very fact that Dr. Karr noted that T.L. "worked unevenly," "carelessly," "gave up easily," and "required repeated instructions" should have alerted the ALJ that T.L. might have had more serious problems in this domain than he thought was the case. (R. 316.) Social Security Ruling 09-4p, which governs this functional domain, explains that a child may have marked or extreme restrictions in attending to tasks when she is slow to focus on work that is of little interest, gives up easily, and needs extra supervision to remain on task. That is what Dr. Karr described. Dr. Smith's observation that T.L. was indifferent to what was asked of her reinforces the issue. Instead of discussing the matter, the ALJ once more blamed T.L. herself for the symptoms that interfered with her capacity to focus, stating that "her performance on the testing at St. Bernard and before Dr. Karr was not her best performance." (R. 26.) That fails to address T.L.'s actual behaviors or to assess the degree to which they were age appropriate.

Part of the problem with the ALJ's discussion of this issue is that he failed to grasp the importance of the modifications that T.L. was given at school as part of her IEPs. A functional equivalency analysis places significant stress on such special education accommodations. An ALJ must apply the "whole child" approach at this stage of the analysis by comparing the child's functioning to that of other children her age who are not impaired. SSR 09-1p. Social Security Ruling 09-2p takes particular care in describing the account ALJs must take of the extra supports a special education child receives:

29

This information about supports children receive can be critical to determining the extent to which their impairments compromise their ability to independently initiate, sustain, and complete activities. In general, if a child needs a person, a structured or supportive setting, medication, treatment, or a device to improve or enable functioning, the child will not be as independent as same-aged peers who do not have impairments. We will generally find that such a child has a limitation, even if the child is functioning well with the help or support. The more help or support of any kind that a child receives beyond what would be expected for children the same age without impairments, the less independently the child functions, and the more severe we will find the limitation to be.

SSR 09-2p.

The ALJ's reasoning disregarded this directive. He dismissed the serious degree of T.L.'s poor performance on Dr. Karr's and the St. Bernard WISC-IV and WRAT-4 tests by comparing those results with various aspects of T.L.'s school records. In doing so, the ALJ did not account for the fact that T.L. took the standardized tests without the accommodations that were provided to her at school. The ALJ overlooked, for example, that T.L. was given a 40 percent extension of time to complete class assignments, a 30 percent extension for homework assignments, and various other accommodations that included limited concept testing, accuracy and behavior checks every 15 minutes, additional verbal clues, and motivational rewards on a daily basis. (R. 399.) Thus, the fact that T.L.'s school records may have suggested a higher level of functioning than the standardized scores indicated was not necessarily evidence that the ALJ could use to support his decision. He could only reach that conclusion by considering her school accommodations and by comparing T.L.'s functioning to non-impaired children her age – issues the ALJ never addressed.

The same is true of other aspects of the ALJ's discussion. He noted that one teacher said that T.L. had only a slight problem in paying attention or focusing long enough to complete

tasks. (R. 32, 200.) That is true. As noted above, however, T.L. was also given an array of prompts, proximity to teachers, and threats and rewards to ameliorate the fact that she "often engages in off task behaviors." (R. 404.) That should have put the ALJ on notice that T.L.'s ability to complete tasks in school required a more careful analysis. Social Security Ruling 09-4p states that "[t]he need for prompting demonstrates that the child is not paying attention as appropriately, effectively, or independently as children of the same age who do not have impairments. Despite the fact that the child is paying attention with prompting, this child is not functioning well in this domain." SSR 09-4p. The ALJ was obligated to account for the fact that T.L.'s ability to succeed in attending to tasks in a school setting depended on the accommodations that SSR 09-4p describes as indications that a child is not performing as well as non-impaired children her age. Without doing so, he could not conclude that she could achieve the same results in all settings.

The ALJ suggested in other parts of his decision that T.L. was not as impaired in this domain as Claimant stated because she was able to focus on some things like Facebook with great intensity. (R. 21.) The latter observation stemmed from Claimant's testimony that T.L. at times stayed on Facebook throughout the night. (R. 93.) Like other aspects of the ALJ's reasoning, that also required further consideration under the Rulings that govern this domain. Social Security Ruling 09-4p explains that "[s]ome children with impairments can attend to some tasks, but not to all tasks in all settings. Such children may exhibit 'hyperfocus,' an intense focus on things that interest them, such as video games, but be limited in their ability to focus on other tasks." SSR 09-4p. The record strongly suggests that was the case with T.L. Instead of accounting for SSR 09-4p's directive, however, the ALJ dismissed the seriousness of T.L.'s ADHD symptoms because she was not taking medication. (R. 33.) That was erroneous for the

reasons discussed above.

Finally, the ALJ failed to consider the possibility that T.L.'s limitations in attending and completing tasks could have been related to other aspects of her impairments. The Rulings that describe the six functional domains stress that a child's limitations in one area may cause restrictions in others. Social Security Ruling 09-3p is illuminating on this topic. It states that children with limitations in acquiring and using information may have "mental impairments that affect a child's ability to attend or to complete tasks." SSR 09-3p. The ALJ found that T.L. had a marked limitation in acquiring and using information, yet he never considered whether that finding implied more severe restrictions in T.L.'s capacity for completing tasks. That is especially troubling in this case because T.L.'s school records repeatedly link the two domains. As noted earlier, for example, the 2011 IEP stated that she required assistance to complete tasks because T.L. "has poor retention skills and lacks the academic skills at her grade level to complete assignments given independently. Due to her poor skill set in these areas," [T.L.] frequently engages in off task actions. (R. 366.)

Without discussing these issues, and absent any comparison between T.L. and non-impaired children her age, substantial evidence does not support the ALJ's finding that T.L.'s limitation in attending and completing tasks was less than marked.

## 2. Interacting and Relating With Others

As part of this functional domain, an ALJ considers "how well you initiate and sustain emotional connections with others, develop and use the language of your community, cooperate with others, comply with rules, respond to criticism, and respect and take care of the possessions of others." 20 C.F.R. § 416.926(i). Examples of appropriate behaviors include using appropriate words and actions with parents, siblings, and teachers in a variety of emotional and behavioral

settings, taking verbal and nonverbal turns, and following social rules of behavior. 20 C.F.R. § 416.926a(i)(1). A child between the age of six through 12 should be able to talk to people with different points of view and understand how to work in groups. 20 C.F.R. § 416.926a(2)(iv). Inappropriate behaviors include lacking close friends, difficulty in cooperating and communicating with others, and being overly anxious in trying new experiences. SSR 09-5p.

The ALJ began his discussion with same language he used to explain why T.L.'s social functioning did not meet or medically equal listing 112.02. (R. 33-34.) The same shortcomings that attended the ALJ's discussion of that issue apply here: the ALJ misconstrued Claimant's testimony on T.L.'s behavior and failed to discuss her domestic and social functioning. The latter point is especially important in a functional analysis because SSR 09-5p stresses that the domain of interacting and relating to others "includes all aspects of social interaction with individuals and groups at home, at school, and in the community." SSR 09-5p.

The ALJ relied instead on T.L.'s school records instead of addressing her social or domestic life. He cited Ms. Graham's fourth grade report that T.L. did not have serious problems in 11 of 13 behavioral categories. (R. 34, 221.) Yet Ms. Graham had only known T.L. for three months. (R. 218.) ALJ did not explain why such a short-term view of T.L.'s behavior outweighed the school records described above that document much more serious instances of aggression and even violence. Even T.L.'s fourth grade IEP presents a very different view of her behavior than the one Ms. Graham gave. It states that she "will often engage in off task behaviors such as untimely talking to classmates, verbal/physical aggression towards peers and adults, and at times defiant behaviors. She attempts to compensate for her deficits by copying answers from her classmates and sometimes bullying them to do so." (R. 357.) It further states that she "has consistently exhibited negative interactions with adults and peers over the years."

(R. 368.) These behaviors directly violate SSR 09-5p's instruction that "when interacting with a parent, teacher, or other adult, the child needs to convey respect for the adult. When interacting with peers, the child needs to convey willingness to play fairly and follow the rules[.]").

Ms. Santacruz's fifth grade report, which is described above, reinforces the view that T.L. exhibited behavioral problems that were more serious than the ALJ thought. She stated, for instance, that T.L. "displays bullying behaviors with severity." (R. 273.) The ALJ recognized many of Ms. Santacruz's concerns about T.L.'s problems. (R. 34.) Nevertheless, he dismissed the seriousness of her opinion by claiming that it was issued when T.L.'s behavior was at its worst, and that it consequently indicated only a "brief downturn" that was odds with the longitudinal record. (R. 34.) Nothing in the record supports such a characterization. Ms. Santacruz had known T.L. for 18 months, suggesting that she was more familiar with T.L.'s behavior than any evidentiary source other than Claimant. (R. 270.) In addition, Ms. Santacruz's fifth grade report presumably encompassed one-fifth of T.L.'s academic experience at the time it was issued. (R. 270.) A report based on such a significant portion of T.L.'s behavioral history does not constitute the kind of "brief downturn" that the ALJ suggested.

Far from contradicting the longitudinal record, moreover, Ms. Santacruz's report was largely consistent with the school records concerning T.L.'s aggressive and disruptive behaviors. It is true, as the ALJ said, that T.L.'s fifth grade behavior appears to have involved a greater degree of disruption than she showed during other years. The ALJ, however, was required to account for all of those behaviors instead of discounting them because T.L. had recently improved or because he thought that she could have controlled her behavior had she wanted to do so. As discussed earlier, a proper analysis of child disability claims does not rely solely on distinguishing between a child's maximal and minimal functioning. Nor do the regulations and

Rulings that govern the six functional domains ask if a child has "improved" without also considering the context within which such improvement occurred. *See A.H. ex rel. Williams v. Astrue*, No. 09 C 6981, 2011 WL 1935830, at *11 (N.D. Ill. May 18, 2011) ("The regulations governing an initial determination of childhood disability do not ask an ALJ to consider improvement but rather to 'compare your functioning to the typical functioning of children your age who do not have impairments.'") (citing 20 C.F.R. § 416.926a(f)(1)); *see also Sewell ex rel. HMC v. Comm. of Soc Sec.*, No. 10-12520, 2011 WL 3566471, at *9 (E.D. Mich. July 20, 2011) (noting that "the ALJ's reliance on claimant's 'improvement' does not constitute substantial evidence"). Rather, SSR 09-5p states that the ALJ's task is to "focus first on the child's activities, and evaluate how appropriately, effectively, and independently the child functions compared to children of the same age who do not have impairments." SSR 09-5p. The ALJ repeatedly assumed that T.L.'s improved behavior during the four months that she had been in the sixth grade was sufficient to explain why she did not have a marked limitation at any time since January 1, 2008. That was erroneous without also considering how T.L.'s behavior, improved or otherwise, compared to non-impaired children her age throughout the disability period.

To further support his functional equivalency analysis, the ALJ cited Childhood Disability Evaluation Forms issued by state-agency expert Dr. Kirk Boyenga on December 14, 2011 and by Dr. James Hinchen and Dr. Thomas Low on May 16, 2012. (R. 28, 318-23, 334-39.) Both sets of experts found that T.L. had a less than marked restriction in the domains of attending and completing tasks and interacting and relating with others. The ALJ gave "great, but not very great" weight to Dr. Boyenga's opinion. Drs. Hinchen and Low were assigned "moderate" weight based on his disagreement with their conclusions on issues that are not

relevant here. The ALJ adopted in full Dr. Hinchen's and Dr. Low's opinions about T.L.'s ability to complete tasks and interact with others. (R. 28.)

Substantial evidence does not support the ALJ's reasons for agreeing with the state-agency doctors' assessments. First, the ALJ's evaluation of these reports contradicts the reasoning that he relied on in order to reject the St. Bernard report that supported Dr. Dres' opinion. As discussed above, the ALJ discounted the St. Bernard report because Dr. Smith did not have an "established long-term relationship" with T.L. (R. 20.) The state-agency doctors, however, had no relationship with her at all because they never examined T.L. The regulations advise ALJs that they are required to "give more weight to the opinion of a source who has examined [the claimant] than to the opinion of a source who has not." 20 C.F.R. § 404.1527(d)(1). That is not to say that an ALJ may not give state-agency reports the weight they deserve, including greater weight than an examining source, when the record supports such a finding. *Ketelboeter v. Astrue*, 550 F.3d 620, 625 (7th Cir. 2008); *Craft*, 539 F.3d at 678. *See also* 20 C.F.R. § 404.1527(d)(2)(i)-(ii) (stating that an ALJ should consider the length and nature of the treating relationship). There is nothing in this record that justifies applying different standards of review to different experts who evaluated the same claimant.

Second, the ALJ himself noted that Dr. Boyenga was not familiar with the complete record or with Claimant's testimony. The ALJ nevertheless concluded that the non-examining physicians' reports were consistent with the long-term record. (R. 28.) Consistency between an expert's report and the record can mean that it deserves great weight. 20 C.F.R. § 404.1527(d)(4). Here, however, the ALJ failed to account for what it was that the state-agency experts had or had not reviewed. Dr. Boyenga was only familiar with Dr. Karr's report, Ms. Graham's fourth grade report, and a medical entry that did not address the relevant functional

domains. (R. 323.) That meant that he knew nothing about the extent and seriousness of T.L.'s behaviors at school or at home. Dr. Boyenga was unfamiliar, for example, with Ms. Santacruz's report, the fact that T.L. had been suspended 15 to 20 times during the fifth grade, or the various IEP concerns cited above about her continuing problems in interacting with teachers or other children. Drs. Hinchen and Low also lacked access to Ms. Santacruz's report, Claimant's testimony, or much of T.L.'s school records. The only additional document they received on reconsideration was an unidentified January 9, 2012 school report. (R. 339.) The ALJ never addressed why the state-agency experts correctly assessed T.L.'s impairments when they were unaware of significant aspects of her behavior.

The ALJ supported his assessment of the expert reports by once again citing T.L.'s participation in team activities like basketball and the drill team, reasoning that they "are both very social endeavors." (R. 28.) To an extent, that is correct. But the fact that T.L. had been kicked off the basketball team during the fifth grade for fighting suggests that her participation in group events was not, at least in itself, a fully-reliable index of her ability to interact with others. It certainly says nothing meaningful about her ability to attend and complete tasks. Moreover, the ALJ never reconciled his evaluation of this issue with Dr. Dres' testimony. Dr. Dres recognized that T.L.'s participation on the basketball team had helped her improve her behavioral problems. He still thought, however, that she had a marked restriction in her social functioning and met the criteria for listing 112.02. Dr. Dres' opinion was of special importance in this case because he was the only medical expert who was familiar with the entire record, including the school notes and Claimant's testimony that the state-agency doctors did not know about. Without first explaining why Dr. Dres' incorrectly interpreted T.L.'s extracurricular activities, the ALJ was not entitled to cite T.L.'s participation in sports to give great weight to the

non-examining doctors.

The ALJ's failure to discuss the expert opinions properly, or to account for the full range of T.L.'s school and domestic behaviors, means that substantial evidence does not support his finding that T.L. had less than a marked restriction in the domains of attending and completing tasks and interacting and relating to others.

### III. CONCLUSION

For the reasons stated above, Claimant's Motion for Summary Judgment [ECF No. 14] is granted. The decision of the Commissioner is reversed, and the case is remanded for further proceedings consistent with this Memorandum Opinion and Order.

Jeffrey T. Gilbert
United States Magistrate Judge

Dated: November 14, 2016